# No. 4706.

## (Court of Appeal, Parish of Orleans.)

## JOHN F. LINDNER vs. W. F. STOCK ET AL.

Theo. Cotonio for plaintiff and appellee.

Woodville & Woodville for defendant and appellant.

Titche & Rogers attorneys.

GODCHAUX, J.—The plaintiff is the owner of a two-story building situated at the corner of Carondelet and Union Streets, in this city. He occupies a portion of it fronting on Carondelet Street, while the adjoining and remaining portion, separated by a party or partition wall from that portion occupied by him and forming the corner of the two streets, he leased for a term of years, for barroom purposes, to the defendant, Stock, under a lease which provides that the latter would, at his own expense, make all alterations and improvements necessary to convert the premises to his uses. The lessee, as soon as he secured possession, and in order to provide a vestibule entrance to the leased property, immediately proceeded to tear out the wall upon the ground floor and as far us as the first story and to insert a steel beam or joist under and as a support to the wall which still remained, one end of this steel beam resting upon a steel pillar or post which

— 31 —

ne erected at the corner of the property lines and the other end of which rested upon the old party or partition wall which separated the property leased from that occupied by the owner, the plaintiff Lindner.

Shortly after this work was done the city authorities condemned as unsafe and dangerous the wall which had thus been altered, and notified Lindner that the wall would be demolished by the City, unless he himself proceeded to put it in a safe condition by rebuilding or repairing it. Lindner immediately notified the defendant, Stock, of the receipt of this communication, informed him that the unsafe condition of the wall was due to the alterations that had been made, and called upon him to rectify the conditions which the city complained of.

Stock paid no attention to this communication and Lindner, having placed him in default, thereupon proceeded to have the work done himself by a contractor, under the directions of a skilled engineer, and expended in this work the sum of $1,100, being the amount paid contractor, and $110 being the amount paid the engineer, or a total of $1,210.

Alleging the foregoing facts, and the further fact that he incurred an expense of $150 for legal advice in connection with the threatened action of the City of New Orleans, Lindner filed the present suit seeking to recover the amount of these expenditures, aggregating the sum of $1,360, with legal interest thereon from judicial demand. There was judgment for the $1,210, and the defendant prosecutes the present appeal.

We find the following facts clearly established by the evidence, to-wit:

Previous to the execution of the lease to Stock, and before the latter had made any alterations, the Carondelet Street front or wall of the building, which was a very old one, was considerably out of the perpendicular,

at the level of the second story, the effect of which was to create a "bulge" in the wall at this point. In the Union Street wall, as well as that portion above the first story of the party wall separating the property leased from that still occupied by the owner, Lindner, were several cracks evidencing a settlement in the same direction as that of the front or Carondelet Street wall. The crack on one side of this party wall had at some indefinite period in the past been filled up, but subsequent to this, and prior to the alterations made by Stock, this crack had become reopened and enlarged so as to leave a new opening or crack between the filling and receding wall.

In further evidence of this settlement it is shown that the matting joints upon the floors had been pulled apart in places, while the baseboard against the party wall in one of the rooms upon the second floor had been patched so as to cover up an opening made therein by the settlement of the wall. Upon the whole there is, in addition to these facts, ample evidence to justify the conclusion that, before Stock made any alterations to the premises, the front wall on Carondelet Street, which was the subject of the condemnation by the city, was in a bad, if not in an unsafe and dangerous, condition.

While the foundations at certain points were relieved of the weight or load of that part of the wall which was removed below the second story, the effect was to throw and concentrate the load of the remaining portion of the wall, constituting the portion above the second story, upon two points alone of the foundation—namely, at the corner, where the supporting beam was upheld by an iron column, and at the party wall at its junction with the front wall, at which point the beam was supported by and embedded in the party wall. It is claimed on behalf of the plaintiff (and it is upon this claim that he must rely to recover) that by the effect of this work the load or

weight carried upon the foundations at each of these two points was doubled, and that neither the foundations nor the soil at these points could support this increased weight; and that, as a consequence, there was a settlement which caused the Carondelet Street wall to lean towards the street to such an extent as to render same so unsafe and dangerous as to bring about its condemnation by the city and the subsequent expenditures in which the owner was involved at the instance of the city.

The plaintiff does not admit the previous poor condition of the wall, but, as we have heretofore said, that condition is abundantly established by the record. If plaintiff recovers therefor he must show that, notwithstanding his wall was in poor condition prior to defendant's alterations, still as a result of these alterations the wall was thrown further out of the perpendicular and as a consequence became unsafe and dangerous. This we believe has been shown with reasonable certainty. It is true the evidence upon this point is conflicting, and in some instances irreconcilable, and that we would in any case follow the conclusions of the lower Court evidenced by its judgment in favor of the plaintiff, still, taking the record as we find it, we are satisfied, upon our independent consideration of this evidence, that the effect of these alterations was to throw the wall further out of the perpendicular than it was before, and to increase in degree the extent of its dangerous and unsafe condition, if as a matter of fact, it was unsafe and dangerous before Stock's work was installed.

In support of this conclusion there is the positive testimony of plaintiff's engineer, the person best qualified by his experience to express his views upon the subject, and the only witness who made a critical and expert examination of the walls and foundations at the time the city condemned the property. This testimony is to the effect

that, though the walls were not in good condition prior to the alterations made by Stock, still, in their then condition, they might have stood for years in safety; that as a result of these alterations the weight of the wall above the second story was concentrated upon two points of the foundations with a stress nearly double that which existed before; that these foundations were unable to withstand this increased load, and that, as a consequence, a subsidence occurred, which resulted in throwing the wall further out of plumb and making it so unsafe and dangerous as to render its demolition and reconstruction necessary.

This testimony is corroborated by the following evidence of subsidence, which appeared subsequent to the completion of Stock's alterations.

(a) The supporting iron piller at the corner was found to be out of the perpendicular to the extent of 1 3-16 inch. While it is true that there is no proof that it became out of plumb since its installation, still the presumption is that originally it was properly installed and originally perpendicular.

(b) The foundation under this iron column had not been reinforced, and showed a new crack or break.

(c) At the time of this witness' examination of the premises the Carondelet Street wall was found to be in no manner cemented or tied to the party wall, and this would indicate a settlement of the Carondelet Street wall due to the alterations, because all of defendant's witnesses who examined the premises previous to these alterations, insist that, at the time of such examination, the two walls were tied and cemented together.

(d) A new cement lintel adjacent to the pilaster upon which the one end of the steel beam rested and installed coincidently with Stock's alterations showed a new and

well-defined crack apparently due to a settling of this pilaster.

(e) In one of the offices on the second floor the party wall in question developed a new crack immediately after the completion of Stock's alterations, while no crack had existed or was apparent on that side of the wall before.

The foregoing corroborative facts stand uncontradicted in the record, and while the effect of them is disputed, we are satisfied that they prove plaintiff's contention to the effect that the alterations caused the dangerous and unsafe condition of the wall which necessitated the expenditures which plaintiff seeks to recover.

While we are satisfied that plaintiff's right of recovery is established, we cannot approve the extent of recovery allowed by the judgment of the lower Court.

It is true that on account of the improper acts of the defendant, plaintiff made the expenditures recited in his petition, but it does not follow that these expenditures fix the amount of his damage nor the sum he is entitled to recover. All that plaintiff can ask is that he emerge from this transaction without loss or advantage, and that he be placed in as good a situation as he occupied before the acts complained of were committed. Should we follow the course of the lower Court and make the defendant reimburse the plaintiff the full amount which the latter expended, the result will be that the plaintiff will distinctly profit from the transaction, for his old and previously-delapidated walls, foundations and window openings have been straightened, strengthened and rebuilt, and he is consequently now in the possession and enjoyment of a building that is practically new and wholly efficient—all to his great benefit and advantage and without the slightest cost to him.

Even should the measure of damages be gauged by his expenditures, it is extremely doubtful whether he could,

in any event, recover the two items of expenditure which consist of the fees paid respectively to the architect and to the attorney for legal service. On the other hand, we are satisfied that in any event and no matter what measure of damages may be adopted, there must be deducted from the plaintiff's bill of expenditures such sum as represents the difference in value and efficiency between the newly-constructed wall and the old dilapidated one that previously existed, for, as a result of and as against the expenditures, he has certainly been benefited to that extent.

The condition of the record makes it extremely difficult for the Court, under the equitable and discretionary power reposed in it by virtue of Article 1934, R. C. C., to determine precisely what allowance in favor of plaintiff would, under all the circumstances of the case, do equal justice between the parties, while to remand the case would only serve to increase the judicial costs already incurred, and would not result in throwing much light upon the question, for the evidence to establish the value or efficiency of the building as it now exists, as compared with its previous condition, would necessarily consist largely, if not wholly, of the opinion of witnesses. Upon the whole, and basing our finding upon the facts and data that we have before us, it is our opinion that by reducing the judgment of the lower Court to $700, neither of the parties to this litigation will have cause for complaint.

It is further ordered, adjudged and decreed that the judgment appealed from be reduced from $1,210 to the sum of $700, and that, as thus amended, the judgment be affirmed, plaintiff to pay the costs of appeal.

December 13, 1909.

Rehearing refused January 10, 1910.

No. 4638.

(Court of Appeal, Parish of Orleans.)

## HEIRS OF ANT. WEBER vs. JOSE P. MARTINEZ.

J. Z. Spearing, Geo. Montgomery for plaintiff and appellant.

Gabriel Fernandez, attorney.

H. J. Rhodes for defendant and appellee.

ST. PAUL, J.—This is a suit to annul a tax title pure and simple, an action recognized in terms by the very Constitution of the State.

We annex a sketch of the property in controversy, from which it will be seen that it is of irregular shape and forms the corner of New Orleans and Liberal Streets, measuring 199' 7" 6''' front on the former, and 181' 6" 6''' on the latter, the opposite or rear lines measuring re-

NEW ORLEANS STREET

ST. BERNARD STREET

LIBERAL STREET

FORCE STREET

(Square 1179)

PROPERTY OF
J.P.Martinez

PROPERTY IN CONTROVERSY

spectively 99' 5" 2'" and 191' 5" 3'". It is composed of eight lots, of various dimensions, as shown in detail on the sketch, two of which front on New Orleans Street, five on Liberal Street, and one forms the corner of the two streets. The area is approximately the same as that of a square measuring 160 feet each way.

Antoine Weber purchased this property in 1844. He owned no other property in the same square, No. 1179.

From 1880 to 1884 the property was assessed as follows: "Square 1179. St. Bernard, New Orleans, Liberal and Force, Antoine Weber. New Orleans & Liberal, 160x 160', $300."

In 1885 the poperty was sold to the State for the unpaid taxes of 1882 and described in the deed as "Certain lots of ground and improvements thereon in the Third District of the City of New Orleans, in Square No. 1179, bounded by New Orleans, Liberal, St. Bernard and Force Streets. Said lots front on New Orleans Street."

On September 4, 1903, the State Auditor, proceeding under the provisions of Section 3 of Act No. 80 of 1888 sold said property to the defendant, describing it as: "Eight lots of ground and improvements in the Third District, in Square 1179, bounded by New Orleans, Liberal, St. Bernard and Force Streets. Said lots front on New Orleans and Liberal, and measure 200' on New Orleans and 191' on Liberal." It does not appear whence the Auditor obtained the description by which he sold.

The property is unimproved. Defendant was at one time, at least, in physical possession thereof, and had surrounded same by a fence; he also paid all taxes thereon since obtaining his deed. There is some conflict of testimony as to whether he is in physical possession at this time, but admittedly plaintiffs have at no time been in physical possession of the land.

Numerous points are urged pro and con the validity of the conveyances under which defendant holds title, but

we deem it necessary to consider only one, viz: whether the description under which the State acquired at tax sale in 1885 is sufficient to identify the property.

If the description be sufficient for that purpose, the constitutional prescription of three years has long since been accomplished and plaintiffs cannot now maintain this action. On the other hand, if that description be so fatally defective as not to identify the property, the defect was one which could not be cured by that prescription, and was, therefore, necessarily too defective to convey title.

### 117 La. 686; 121 La. 200.

Now it will be perceived that the description in the Auditor's deed is not identical with that given in the tax deed to the State, nor is the description in the latter identical with that given in the assessment roll.

The description in the Auditor's deed describes the property with sufficient accuracy for any purpose. But the description in that deed cannot cure the defect if any there be in the original tax deed to the State. ''Tax proceedings must stand or fall as made. * * * If there has been error, the error is fatal, and cannot be corrected by **exparte** consent proceedings to which the owner has not consented or been privy.''

### Ramos Lumber Co. vs. Labarre, 116 La. 581.

Hence, the inquiry must be directed towards the description in the tax deed to the State, and the first question that arises is whether that description, if defective, can be supplemented by production of the tax rolls.

The tax deed might indeed have referred to the roll and made the description in the roll part of the deed. **(Wilson vs. Marshall, 10 An. 329.)** But ''what the State officers may have intended to do or could have legally done was merged into what they actually did.'' **(Ramos**

Lumber Co. vs. Labarre, 116 La. 581.) In this case the description in the roll was not referred to or made a part of the deed. ''A party claiming under a tax deed necessarily relies in the letter of his bond.'' (Stout vs. Masten 139 U. S. 155.) The purchaser at tax sale should be able ''to put his foot on a particular spot of ground and say, by virtue of his deed, 'this was S' and now is mine.' '' * * * Where the deed does not enable him to do this it is not ''translative of property in any particular thing, and labors under a defect which time cannot cure.'' (Wilson vs. Marshall, 10 An. 330.)

We are of opinion that the description in the tax roll forms no part of the description in the tax deed, unless expressly so made, and accordingly the deed is void if the description therein be too defective to identify the property, even though the description in the tax roll might have been sufficient for that purpose.

### Stout vs. Masten, 139 U. S., p. 155.

As to the description in the tax deed it is manifestly too defective to be ''translative of property in any particular thing.'' The expression ''certain lots of ground'' may mean any number of lots from two to twenty or more, and the term ''a lot of ground'' gives no more definite idea of quantity than the term ''a tract of land.'' Neither location, dimensions, area nor boundaries are given, and the description might cover the whole square or any portion thereof touching New Orleans Street, no matter how large or how small.

No one would accept such a description in an act of sale or mortgage. Defendant himself would not accept it; the Auditor's deed, to which defendant became a party by his acceptance thereof, is a confession that the description in the tax deed was too defective for a deed, otherwise there was no reason to vary the description in so many

material particulars, such as giving the number of lots, the location and dimensions.

The State had no title and the Auditor could convey none to defendant.

So much for the sale for the taxes of 1882, and the Auditor's deed under which defendant claims.

But defendant further urges that plaintiffs are without interest in the lots in controversy as same were forfeited to the State for the unpaid taxes of 1873 to 1878, and were afterwards adjudicated to defendant under the provisions of Act 82 of 1884, to-wit: In 1886, at which time defendant first took possession of the property. It is admitted, however, that defendant never complied with his adjudication or took out any deed thereunder.

There is no evidence on the subject in the record other than an informal certificate by the Tax Collector (June 24, 1904), that the property was sold to the defendant for the taxes of those years, whilst a research of later date (September 20, 1907), says that there are now no records in the Tax Collector's office of the taxes of those years.

An informal certificate by the Tax Collector has none of the probative force given by law to a tax deed, and, hence, does not supply the proof which such a deed would have made. Such a certificate furnishes no proof that the property was ever assessed for those years, or that the taxes for those years were not paid, or that any of the prerequisites and formalities necessary for a valid forfeiture were ever complied with. The lack of records for those years now makes the proof impossible. Hence, there is no proof in this record to warrant a Court in adjudging that the property was ever forfeited to the State, and a forfeiture must be shown, it cannot be assumed.

We are of opinion that the plaintiff's title to the property in controversy has never been divested.

It is, therefore, ordered that the judgment of the District Court be annulled, avoided and reversed, and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiffs and appellants, Mrs. Caroline Stendlien, wife of John Chorreau; Mrs. Annie Stendlien, widow of Frank Meninger; Frank Stendlien and Charles Stendlien, and against the defendant and appellee, Jose P. Martinez, recognizing said plaintiffs as the owners of the property in controversy herein, and more fully described in their petition and in an act of sale by Chas. L. H. Kernion to plaintiffs' ancestor Antoine Weber, passed before Joseph Cuvillier, notary, on March 13, 1844, and registered in the Conveyance Office in Book 36, folio 130. It is further ordered that the sale by Chas. Cavanac, State Tax Collector, to the State of Louisiana, passed before A. A. Ker, notary, on March 14, 1885, and registered in C. O. Book 122, fol. 614-703 be canceled and erased in so far as the same purports to effect certain lots of ground in Square 1179, bounded by New Orleans, Liberal, Force and St. Bernard Street, fronting on New Orleans Street and sold as the property of Antoine Weber. It is further ordered that the sale by W. S. Frazee, State Auditor, to Joseph P. Martinez, dated September 4, 1903, and registered in C. O. Book 197, fol. 119, be canceled and erased. It is further ordered that said J. P. Martinez be enjoined and prohibited from laying any further claim to said property, and that he pay the costs of both courts. It is further ordered that the right be reserved to the said Joseph P. Martinez to recover of plaintiffs the price of adjudication with 20% penalties and the taxes paid by him.

Decree Supreme Court March 16, 1910.